UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

JUL 19 2007

MICHAEL N. MILBY, CLERK OF COURT

|   |   |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JASON EDWARD STEPH, <br><br> Defendant. | Criminal No. H 07-307 <br><br> **Violations:** <br> 18 U.S.C. § 371 (Conspiracy to Violate the Foreign Corrupt Practices Act); <br> 18 U.S.C. § 1956(h) (Money Laundering Conspiracy) <br> 18 U.S.C. § 1956(a)(2)(A) (Money Laundering) |

# INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment (unless otherwise stated):

1. The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization or payment of money or anything of value to a foreign government official or political party for the purpose of securing any improper advantage,

or of assisting in obtaining or retaining business for, or directing business to, any person.

**Relevant Entities**

2. The Federal Republic of Nigeria ("Nigeria") was a sovereign African nation with substantial deposits of oil and gas within its territory, both on land and offshore in the Niger Delta region. A political party referred to in this Indictment as the Political Party ("PP") has been the dominant political party in Nigeria from 1999 to the present.

3. The Nigerian National Petroleum Corporation ("NNPC") was a government-owned company charged with the development of Nigeria's oil and gas wealth and regulation of the country's oil and gas industry, and was the majority shareholder in certain joint ventures with various multinational oil companies. National Petroleum Investment Management Services ("NAPIMS") was a subsidiary of NNPC that, among other things, oversaw Nigeria's investments in the joint ventures and other development projects. The NNPC and NAPIMS were entities and instrumentalities of the Government of Nigeria, within the meaning of 15 U.S.C. Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A). Shell Petroleum Development Co. of Nigeria, Ltd. ("SPDC") was the operator of a joint venture among NNPC (55%), SPDC (30%), and two foreign oil companies, TOTAL (10%) and Agip Oil (5%) (the "Joint Venture").

**Willbros Group, Inc. and Certain of its Operations in Nigeria**

4. Willbros Group, Inc. ("WGI") was a corporation organized under the laws of the Republic of Panama in 1975 (WGI's predecessor companies date back to 1908), and having its principal place of business in Tulsa, Oklahoma (until 2000) and Houston, Texas (2000 to the present). WGI provided construction, engineering and other services in the oil and gas industry, and conducted international operations through a wholly-owned subsidiary, Willbros

International Inc. ("WII"), a Panamanian corporation which also maintained its principal place of business in Tulsa, Oklahoma and, beginning in 2000, Houston, Texas. WGI, a public company since 1996 whose shares traded on the New York Stock Exchange under the symbol "WG", was an "issuer" as that term is used in the FCPA (15 U.S.C. Section 78dd-1(a)). In addition, because the principal places of business of WGI and WII were in the United States, WGI and WII were "domestic concerns" under the FCPA (15 U.S.C. Section 78dd-2(h)(1)(B)).

5. Until sale of its assets in Nigeria in early 2007, WGI conducted business in Nigeria for over forty years. Three WGI subsidiaries which conducted WGI's Nigerian business were Willbros West Africa, Inc. ("WWA"), Willbros Nigeria Ltd. ("WNL"), and Willbros Offshore Nigeria Ltd. ("WONL") (collectively referred to herein as the "Willbros Nigerian Subsidiaries").

6. The Willbros Nigerian Subsidiaries performed work on certain Joint Venture and other Nigerian oil and gas projects from the 1990s through 2005. Among the many projects in which one or more of the Willbros Nigerian Subsidiaries participated was the Eastern Gas Gathering System ("EGGS") project, a natural gas pipeline system in the Niger Delta designed to relieve existing pipeline capacity constraints. On certain Nigerian projects, including EGGS, one or more of the Willbros Nigerian Subsidiaries partnered with a German construction company ("GCCB"), a subsidiary or affiliate of a multinational construction services company based in Mannheim, Germany.

7. The EGGS project, which was divided into two phases, contemplated the construction of a major natural gas pipeline system through remote, swampy and otherwise difficult terrain in the Niger Delta. Phase 1 involved engineering, procurement and construction

(known as "EPC") of a pipeline from the Soku Gas Plant to the Bonny Island Liquified Natural Gas Plant. EGGS Phase 1 included an optional scope of work (known as "EGGS Coating") for the application of a Polyethylene-concrete coating to the EGGS Phase 1 pipeline to give it sufficient weight and protection. EGGS Phase 2 was another optional scope of work within the EGGS Phase 1 proposal, and contemplated the construction of a pipeline from an area known as the "Gbaran/Ubie node" to Soku.

**The Defendant and Other Relevant Individuals**

8. Defendant STEPH was a United States citizen and employee of WII. WII employed STEPH from in or about 1998 to April 2005, when he resigned. STEPH held the position of General Manager – Onshore in Nigeria from 2002 to April 2005. Because STEPH is a United States citizen and was an employee and agent of WII and WGI, STEPH was a "United States person," a "domestic concern," an employee and agent of a domestic concern, and an agent of an issuer, under 15 U.S.C. Sections 78dd-2(i)(2), 78dd-2(h)(1)(A), 78dd-2(a), 78dd-2(i) and 78dd-1(a), respectively.

9. Co-conspirator Jim Bob Brown ("Brown") was employed by WII from at least 1990 through April 2005, when he was terminated for cause. For the majority of his career with WII, Brown worked on international projects in Nigeria and South America. Specifically, Brown worked in Nigeria as a Cost Engineer (1990 – 1992), Administrative Manager (1992 – 1997) and Division Manager (1997 – August 2000). In August 2000, he was transferred to Venezuela as Managing Director of Constructor CAMSA, C.A., a WII subsidiary, where he worked until he was transferred back to Nigeria as Managing Director in or around November 2004.

10. An unnamed co-conspirator, hereinafter referred to as Doe 1, was a United States citizen and employee of WII from the 1980's through March 2002. From April 2002 until his resignation in January 2005, Doe 1 was an employee of another WGI subsidiary known as Willbros USA, Inc. ("WUSA"), which conducted construction, engineering and facilities development operations in the United States and Canada. In 1995, Doe 1 became Managing Director of WNL. In 2002 and 2003, WGI promoted Doe 1 to senior executive positions within WII and WUSA, and he maintained an office in Houston, Texas.

11. An unnamed co-conspirator, hereinafter referred to as Consultant 1, was a citizen of the United States whose employment included representation of purported consulting companies operating in Nigeria known as Company S and Company F. Companies S and F entered into contracts with WWA in which they purported to perform legitimate consulting services, but in truth acted as conduits for corrupt payments to foreign officials in Nigeria authorized by Doe 1, defendant STEPH and others.

12. An unnamed co-conspirator, hereinafter referred to as Consultant 2, was a Nigerian national who performed purported consulting services for one or more of the Willbros Nigerian Subsidiaries. In and around 2004, Consultant 2 worked in coordination with Consultant 1 in offering and making corrupt payments to Nigerian officials. In 2005, Consultant 2 continued in that role, although he no longer worked with Consultant 1.

13. Unnamed co-conspirators, hereinafter referred to as GCCB Employees 1 and 2, were German nationals who worked for GCCB in Nigeria, and whose responsibilities included the EGGS project.

14. A Canadian national, hereinafter referred to as "CN," was a Canadian national who was employed by WII and worked in Nigeria from 1993 to 1995, and from at least 1998 through May 2005. CN worked as Administrator and General Manager – Finance for WII, and executed WWA's contract with Company F dated April 4, 2003.

15. The intended recipients of the corrupt payments were officials of the Government of Nigeria, instrumentalities thereof, and those acting in an official capacity for and on their behalf: specifically, officials of NNPC, NAPIMS, the PP, a senior official in the executive branch of the Federal Government of Nigeria, as well as officials of SPDC. Each of the government officials was a "foreign official" as that term is defined and used in the FCPA (15 U.S.C. Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A)). The Nigerian government officials are collectively referred to herein as the "Nigerian officials."

## COUNT 1

### Conspiracy to Violate the Foreign Corrupt Practices Act
### (18 U.S.C. § 371)

### THE CONSPIRACY

16. Paragraphs 1 through 15 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

17. From at least in and around December 2003, through in and around March 2005, in the Southern District of Texas, and elsewhere, the defendant,

### JASON EDWARD STEPH,

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate and agree with Doe 1, Consultants 1 and 2, Brown, GCCB

Employees 1 and 2, and others, known and unknown to the Grand Jury, to commit offenses against the United States, that is, willfully to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, or offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official and any foreign political party for purposes of: (i) influencing acts and decisions of such foreign official and party in his and its official capacity; (ii) inducing such foreign official and party to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing an improper advantage; and (iv) inducing such foreign official and party to use his or its influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist WGI, WII, the Willbros Nigerian Subsidiaries, and the joint venture consortium comprised of WWA/WNL and GCCB, and others, known and unknown to the Grand Jury, in obtaining and retaining business for and with, and directing business to, WGI, WII, the Willbros Nigerian Subsidiaries, and the joint venture consortium comprised of WWA/WNL and GCCB, all in violation of Title 15, United States Code, Sections 78dd-1(a), 78dd-2(a) and 78dd-2(i).

## PURPOSE AND OBJECT OF THE CONSPIRACY

18.  The purpose and object of the conspiracy was to make corrupt payments to officials of NNPC, NAPIMS, a senior official in the executive branch of the Nigerian government, and to the PP, as well as to officials of SPDC, in order to assist in obtaining and retaining the EGGS business for WGI, WII, the Willbros Nigerian Subsidiaries and the joint venture consortium comprised of WWA/WNL and GCCB.

## MANNER AND MEANS OF THE CONSPIRACY

19. The manner and means by which the defendant STEPH and his co-conspirators sought to accomplish the purpose and object of the conspiracy included, but were not limited to, the following:

**EGGS Project Chronology**

    a. In anticipation of the EGGS Phase 1 bid, WII subsidiary WWA and GCCB formed a joint venture consortium (the "EGGS Consortium"). In December 2003, the EGGS Consortium submitted a commercial proposal (executed by defendant STEPH and a GCCB employee) to the Joint Venture, through the Joint Venture's operator, SPDC, for pipeline work on EGGS Phase 1 and, among other optional scopes of work, EGGS Coating and EGGS Phase 2. The EGGS Phase 1 contract price for "base scope" was approximately $216,500,000, the EGGS Coating optional scope price was approximately $30,000,000 and the EGGS Phase 2 price was approximately $141,000,000, for a combined total scope of work price of approximately $387,500,000.

    b. After NNPC and NAPIMS approval, the Joint Venture awarded EGGS Phase 1 to the EGGS Consortium in and around May 2004. In July 2004, representatives of the EGGS Consortium and of SPDC (the latter, on behalf of the Joint Venture) executed the EGGS Phase 1 contract, which included the EGGS Consortium's offer to perform the optional scopes of work for EGGS Coating and EGGS Phase 2. Defendant STEPH and GCCB Employee 2 executed the contract on behalf of the EGGS Consortium. In and around August 2004, again after NNPC and NAPIMS approval, the Joint Venture awarded the optional EGGS Coating work to the EGGS Consortium.

c.     In late 2004 and early 2005, the EGGS Consortium continued its efforts to secure the EGGS Phase 2 optional scope of work, but ultimately was not successful in that endeavor.

## The EGGS Bribery Scheme: 2003 - 2004

d.     In and around late 2003 or early 2004, defendant STEPH, Doe 1, Consultants 1 and 2, certain GCCB Employees, and others, known and unknown to the Grand Jury, agreed to make a series of corrupt payments totaling in excess of $6 million to, among others, officials of NNPC, NAPIMS, a senior official in the executive branch of the federal government of Nigeria, and to the PP, as well as to officials of SPDC, to assist in obtaining the EGGS project and its optional scopes of work. In order to secure the funds for these anticipated payments, Doe 1, Consultant 1 and others caused WWA to enter into bogus "consultancy agreements" with Company S and, later, Company F, pursuant to which, in exchange for purportedly legitimate consultancy services (such as advice and information about local labor, raw materials, and introductions to persons of authority in the Nigerian government), those entities invoiced WWA for 3% of the contract revenue received by WWA for certain Nigerian construction and engineering projects, including the EGGS project. The invoices directed payment to a bank outside the United States.

e.     In order to assess whether to submit a bid on a potential job in Nigeria, WII personnel typically prepared documents known as "bid runs," which included, among other information, anticipated costs and profit projections on the proposed work. WII personnel also prepared a budget document which, among other things, set forth anticipated contract revenue, job expenses and profit margin. Defendant STEPH, as the General Manager – Onshore and the

9

senior Nigeria-based WGI representative responsible for the EGGS project, included the anticipated 3% payments to Company S and Company F as an expense in the internal budget taken from the original "bid run" which he personally made, approved and negotiated for that project.

   f. Defendant STEPH, Doe 1 and others knew that Consultants 1 and 2 were engaged, on behalf of the EGGS Consortium, in corrupt negotiations with Nigerian officials who had influence over the EGGS business, and that Consultants 1 and 2 were using and intending to use some or all of the funds paid from WGI's administrative headquarters in Houston, Texas, to Company S and Company F to make corrupt payments to those officials in order to assist in obtaining and retaining the EGGS business. Defendant STEPH, Doe 1 and others known and unknown authorized Consultants 1 and 2 to conduct these negotiations and make offers, payments and promises to pay the officials for the corrupt purposes described above. Defendant STEPH, Doe 1 and others commonly referred to the promises to make such payments as "commitments."

   g. By late 2004 some of the commitments had been paid to the Nigerian officials. However, commitments of millions of dollars more remained to be fulfilled through the continued receipt by the EGGS Consortium of EGGS contract revenue, the payment of 3% of that revenue to Company S and Company F (i.e., Consultants 1 and 2), and subsequent transfer of all or part of those funds to Nigerian officials.

   h. In late 2004, defendant STEPH, Doe 1 and certain GCCB employees became concerned that the EGGS Consortium's ability to obtain the EGGS Phase 2 project was in jeopardy, at least in part due to competition and protests from the Italian company which was

one of the original EGGS bidders.

### Continuation of the Scheme in 2005:  Alternative Funding Sources

i.      In January 2005, WGI announced Doe 1's resignation from WGI and the commencement of an internal investigation into allegations of tax improprieties relating to a WII Bolivian subsidiary operating under Doe 1's management.  The internal investigation quickly expanded to include the corrupt activities of Doe 1 in Nigeria and WGI soon ceased paying Company F invoices and terminated the "consultancy agreement" between WWA and Company F.  In Nigeria, defendant STEPH, Brown and other WII employees learned of demands on behalf of the Nigerian officials for continued payment of the outstanding commitments related to the EGGS business.  Defendant STEPH, Brown, GCCB Employees 1 and 2 and others became concerned that failure to continue paying the commitments would result in interference with WII's business operations and potential loss of the EGGS Phase 2 contract (which had not yet been awarded), valued at approximately $141,000,000.

j.      In and around January and February 2005, defendant STEPH, Brown, Consultant 2 (who was now working on his own), GCCB Employees 1 and 2, and others, known and unknown to the Grand Jury, agreed that defendant STEPH and Brown would raise approximately $1.85 million in cash in Nigeria in order to pay some of the millions of dollars in outstanding commitments that defendant STEPH, Doe 1 and Consultants 1 and 2 had previously made on behalf of WGI, WII, the Willbros Nigerian Subsidiaries, and the EGGS Consortium, regarding the EGGS project and other projects.  Defendant STEPH, Brown and others determined that $1.85 million cash was unavailable to them through WGI, WII or the Willbros Nigerian Subsidiaries, in part because of the increased scrutiny caused by WGI's ongoing

11

internal investigation, and thus resorted to outside sources for most of the funds. Defendant STEPH, Brown, GCCB Employees 1 and 2 and others agreed upon three potential sources of funding: (i) a loan from GCCB; (ii) another loan from the principals of a Nigerian oil and gas company ("Company K"); and (iii) petty cash from an account maintained by one of the Willbros Nigerian Subsidiaries.

k. On or about February 19, 2005, GCCB Employee 2 arrived at Brown's office in Lagos, Nigeria, with a written loan agreement for $1 million and a suitcase containing $1 million cash, the latter to pay part of the outstanding commitments. On its face, the loan agreement provided for GCCB to make a $1 million interest-free loan to WWA and WNL, with repayment on or before December 23, 2005. Brown, on behalf of WWA and WNL, and GCCB Employee 2, on behalf of GCCB, executed the loan agreement and GCCB Employee 2 released the suitcase full of cash to Brown.

l. On or about February 21, 2005, Brown, on behalf of WWA, then purported to "loan" to Consultant 2, pursuant to another written agreement, the $1 million cash, with the intent that Consultant 2 would deliver the funds to Nigerian officials. According to the loan agreement, this loan was repayable by August 31, 2005; the agreement did not specify any interest rate to be charged.

m. In and around February and March of 2005, defendant STEPH, on behalf of WNL, borrowed the Nigerian Naira equivalent of approximately $500,000 cash from principals of Company K, with the intent of using those funds to make payments towards the outstanding commitments to Nigerian officials described above. This loan was repayable in three weeks, with a ten-percent mark-up (i.e., an additional $55,000). The cash was transferred from

Company K to Consultant 2 for further transfer to Nigerian officials.

    n.  In and around February and March 2005, defendant STEPH directed a WII subordinate employee to submit a request to CN and other Nigeria-based personnel for the Naira equivalent of approximately $350,000 from a petty cash account in Nigeria maintained by one of the Willbros Nigerian Subsidiaries. Because there were insufficient funds in the account, the WII subordinate employee, pursuant to a long-standing practice known to defendant STEPH, sought and obtained these funds by falsely inflating petty cash funding requests included within weekly operational funding requests transmitted to WGI's administrative headquarters in Houston, Texas, and covering the inflated amounts with invoices from fictitious vendors representing purportedly legitimate business expenses. In response to these funding requests, WGI treasury department personnel in Houston, Texas, wire transferred United States dollars from a company bank account in Houston to a company bank account in Nigeria, at which account the currency was converted to Nigerian Naira and transferred to the relevant petty cash accounts. Once sufficient funds had accumulated, two WII subordinate employees transferred the funds to STEPH and Consultant 2 to make the remainder of the corrupt payments to the Nigerian officials.

    o.  In and around February and March 2005, defendant STEPH, Brown, a WII Nigeria-based employee whose title was "General Manager -- Offshore," and others contemplated the use of a new purported consulting company (to replace Company S, Company F and Consultant 1) for the purpose of making additional corrupt payments to Nigerian officials for the EGGS project and potentially other projects. Consultant 2 was affiliated with this entity, known as Company BL. Although Brown and Company BL executed a contract in late February, the

heightened scrutiny applied to such contracts resulting from WGI's internal investigation caused WGI ultimately to prevent any payments to Company BL.

## OVERT ACTS

20. In furtherance of the conspiracy and to achieve its purpose and object, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Texas, and elsewhere, the following overt acts, among others:

    a. On or about July 1 and July 9, 2004, Doe 1 sent an email from Houston, Texas, to CN in Nigeria, inquiring about the status of payment of Company S invoices totaling approximately $209,000;

    b. On or about August 5, 2004, Doe 1, in response to an email from CN about whom to contact to obtain a signature on an unsigned Symoil invoice, sent an email from Houston, Texas to CN in Nigeria, directing CN to contact Consultant 1;

    c. On or about August 10, 2004, Doe 1 and CN approved for payment and forwarding by commercial carrier from Nigeria to WGI's administrative headquarters in Houston, Texas, two Company S invoices totaling $912,000;

    d. On or about August 18, 2004, Doe 1 and CN approved for payment and forwarding by commercial carrier from Nigeria to WGI's administrative headquarters in Houston, Texas, a Company S invoice for $106,200;

    e. On or about October 14, 2004, in order to pay the Company S invoices described in paragraph 20(c) and (d) above, an employee in the treasury department at WGI's administrative headquarters in Houston, Texas, caused wire transfers of $912,000 and $106,200 to be made from a WII bank account located in Houston, Texas, to a Company S bank account

outside the United States;

    f. On or about October 31, 2004, Doe 1 sent an email from Houston, Texas, to CN in Nigeria, indicating that Doe 1 intended to contact Consultant 1 to obtain a signature on a Company F invoice to facilitate its processing, and requesting that CN "process the [Company F] invoice as soon as possible;"

    g. On or about November 8, 2004, Doe 1 and CN approved for payment and forwarding by commercial carrier from Nigeria to WGI's administrative headquarters in Houston, Texas, Company F invoice #2004-03P.01 for $870,623;

    h. On or about November 11, 2004, Doe 1 sent an email from Houston, Texas, to CN in Nigeria requesting, among other things, that CN accelerate the payment terms on Company F invoices to payment on receipt instead of forty-five days;

    i. On or about November 17, 2004, in order to pay the Company F invoice described in paragraph 21(g) above, an employee in the treasury department at WGI's administrative headquarters in Houston, Texas, caused a wire transfer of $870,623 to be made from a WII bank account located in Houston, Texas, to a Company F bank account outside the United States;

    j. On or about December 20, 2004, Doe 1 and CN approved for payment and forwarding by commercial carrier from Nigeria to WGI's administrative headquarters in Houston, Texas, Company F invoice # 2004-03P.02 for $785,949;

    k. On or about January 11, 2005, defendant STEPH, responding to an inquiry by WGI's chief financial officer into the nature of services provided by Company F, sent an email from Nigeria to, among others, the chief financial officer and other senior WGI

management in Houston, Texas, asking that Houston-based management "please refrain from sending queries concerning [Company F] to lower level management in my organization," and stating, among other things, that "[t]he 3% [of contract revenue paid to Company F] is included in the budget taken from the original bid run that I made, approved, negotiated and stand by;"

  l. On or about January 29, 2005, defendant STEPH sent an email to Brown and to a senior WII executive in Houston, Texas, forwarding "an internal NAPIMS document" obtained from GCCB Employee 2 regarding the status of the EGGS Phase 2 award to the EGGS Consortium, and proposing a strategy to secure the award which included, among other things, entering into a "consultancy agreement" with a "political friend" of STEPH's whom STEPH "would imagine . . . charges quite a bit for his services", which services STEPH described as approaching a senior NAPIMS executive on behalf of WGI to "get [EGGS Phase 2] back for us . . . . ;"

  m. In and around January and February 2005, Brown communicated by telephone and email between Nigeria and Houston, Texas, to discuss with a WII senior executive, among other things, strategies by which WGI, WII, and the Willbros Nigerian Subsidiaries, collectively or separately, could obtain and retain the EGGS business;

  n. On or about February 23, 2005, an employee in the treasury department at WGI's administrative headquarters in Houston, Texas, caused a wire transfer of $840,000 to be made from a company bank account located in Houston, Texas, to a company bank account located in Nigeria, in payment of a weekly Naira operational funding request (which included a request for petty cash funding);

  o. On or about March 15, 2005, an employee in the treasury department at

WGI's administrative headquarters in Houston, Texas, caused a wire transfer of $550,000 to be made from a company bank account located in Houston, Texas, to a company bank account located in Nigeria, in payment of a weekly Naira operational funding request (which included a request for petty cash funding); and

p.  On or about February 23, 2005, Brown transmitted from Nigeria to WGI executives and counsel in Houston, Texas, a cover email and attached revised draft consultant agreement for the retention of Company BK.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2

### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

21.  Paragraphs 1 through 20 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

22.  From in and around late December 2003, through in and around March 2005, in the Southern District of Texas, and elsewhere, the defendant,

### JASON EDWARD STEPH,

did knowingly, combine, conspire, confederate and agree with Doe 1, Consultants 1 and 2, Brown, GCCB Employees 1 and 2, and others, known and unknown to the Grand Jury, to commit a violation of Title 18, United States Code, Section 1956, that is, knowingly to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

It is further alleged that the specified unlawful activity referred to above is a violation of the Foreign Corrupt Practices Act, Title 15, United States Code Sections 78dd-1(a), 78dd-2(a) and 78dd-2(i).

All In violation of Title 18, United States Code, Section 1956(h).

## COUNTS 3 and 4

### Money Laundering
### (18 U.S.C. § 1956(a)(2)(A); 18 U.S.C. § 2)

23.   Paragraphs 1 through 20 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

24.   On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

**JASON EDWARD STEPH,**

and others, known and unknown to the Grand Jury, did knowingly transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is: violations of the Foreign Corrupt Practices Act, Title 15, United States Code Sections 78dd-1(a), 78dd-2(a) and 78dd-2(i), as follows:

| Count | Date | Transfer |
|---|---|---|
| 3 | November 17, 2004 | wire transfer of $870,623 from a WII bank account located in Houston, Texas, to a Company F bank account outside the United States, in payment of Company F invoice # 2004.03P.01 |

| | | |
|---|---|---|
| 4 | February and March 2005 | two wire transfers totaling approximately $1,390,000 from a company bank account in Houston, Texas, to a company bank account in Nigeria, in payment of weekly Naira operational funding requests (which included petty cash) from WII's Nigerian operations |

All in violation of Title 18, United States Code Sections 1956(a)(2)(A) and 2.

A TRUE BILL                                   **Original Signature on File**

                                                                Foreperson

DONALD J. DeGABRIELLE, Jr.
UNITED STATES ATTORNEY

_/s/ James R. Buchanan_
By: James R. Buchanan
Assistant United States Attorney

STEVEN A. TYRRELL, CHIEF
MARK F. MENDELSOHN, DEPUTY CHIEF
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

_/s/ Thomas E. Stevens_
By: Thomas E. Stevens, Trial Attorney