# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF TEXAS

# HOUSTON DIVISION

UNITED STATES OF AMERICA          CRIMINAL NO. H-07-307

v.

JASON EDWARD STEPH

## PLEA AGREEMENT

The United States of America, by and through Donald J. DeGabrielle, Jr., United States Attorney for the Southern District of Texas and James R. Buchanan, Assistant United States Attorney, Mark F. Mendelsohn, Deputy Chief, and Thomas E. Stevens, Trial Attorney, Criminal Division, Fraud Section of the Department of Justice (together, the "Department" or "United States"), on the one hand, and the defendant, Jason Edward Steph ("Defendant"), on the other hand, pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, have entered into an agreement, the terms and conditions of which are as follows:

### The Defendant's Agreement

1.       Defendant agrees to plead guilty to Count 1 of the Indictment. Count 1 charges Defendant with conspiring to violate the laws of the United States in violation of Title 18, United States Code, Section 371, namely, the

Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code,

Section 78dd-1 et seq.

## Punishment Range

2.     The **statutory maximum** penalty for each violation of Title 18,

United States Code, Section 371, is not more than five (5) years'

imprisonment and a fine of not more than the greater of (a) two hundred fifty

thousand dollars ($250,000), or (b) if any person derived a pecuniary gain

from the offense, or if the offense resulted in pecuniary loss to a person other

than the defendant, not more than twice the gross gain or twice the gross

loss. (18 U.S.C. § 3571). Additionally, Defendant may receive a term of

supervised release after imprisonment of up to three (3) years. (18 U.S.C. §§

3559(a)(4), 3583(b)(2)). Defendant acknowledges and understands that if he

should violate the conditions of any period of supervised release which may

be imposed as part of his sentence, then Defendant may be imprisoned for

the entire term of supervised release, without credit for time already served

on the term of supervised release prior to such violation. (18 U.S.C. §§

3559(a)(4), 3583(e)(3)). Defendant understands that he cannot have the

imposition or execution of the sentence suspended, nor is he eligible for

parole.

2

## Mandatory Special Assessment

3.     Pursuant   to   Title   18,   United   States   Code,   Section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a mandatory special assessment in the amount of one hundred dollars ($100.00) per count of conviction.  The payment will be by cashier's check or money order payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas  77208, Attention:  Finance.

## Fine and Reimbursement

4.     Defendant understands that under the United States Sentencing Commission, Guidelines Manual (the "Sentencing Guidelines" or "U.S.S.G."), Section 5E1.2(d)(7) (Nov. 2003), the Court is permitted to order Defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any is ordered.

5.     Defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment.

6.     Defendant agrees to make complete financial disclosure to the Department and to the Probation Office by, among other things, truthfully

3

executing a sworn financial statement (Form OBD-500) prior to sentencing

if he is requested to do so. In the event that the Court imposes a fine or

orders the payment of restitution as part of Defendant's sentence, Defendant

shall make complete financial disclosure by truthfully executing a sworn

financial statement immediately following his sentencing.

### Settlement With Internal Revenue Service

7.     It is further understood that, prior to the date of sentencing,

Defendant shall file accurate amended tax returns for all tax years in which

additional taxes are due and owing, including but not limited to the years

2000 through 2006, and will pay, or will enter into an agreement to pay, past

taxes due and owing by him to the Internal Revenue Service, including

applicable penalties, if any, on such terms and conditions as will be agreed

upon between him and the Internal Revenue Service. The Department

cannot, and does not, agree not to prosecute Defendant for criminal tax

violations. However, if Defendant fully complies with the understandings

specified in this Agreement, no testimony or other information given by him

to the Department starting on October 18, 2007 (or any other information

directly or indirectly derived therefrom) will be used against him in any

criminal tax prosecution.

## Cooperation

8. The parties understand that this agreement carries the potential for a motion for departure by the Department under Section 5K1.1 of the Sentencing Guidelines. Defendant understands and agrees that whether such a motion is filed will be determined solely by the Department. Should Defendant's cooperation, in the sole judgment and discretion of the Department, amount to "substantial assistance", the Department reserves the sole right to file a motion for departure pursuant to Section 5K1.1 of the Sentencing Guidelines and Policy Statement. Defendant further agrees to persist in his plea through sentencing and fully cooperate with the Department. Defendant understands and agrees that the Department will request that the Court defer sentencing until that cooperation is complete.

9. Defendant understands and agrees that "fully cooperate" as used herein, includes providing all information relating to any criminal activity known to Defendant, including but not limited to the conduct of current and former officers, directors, employees and agents of Willbros Group, Inc., Willbros International, Inc. and their subsidiaries and affiliates. Defendant understands that such information includes state, federal and foreign offenses arising therefrom. In that regard:

(a)    Defendant agrees that this plea agreement binds only the Department; it does not bind any other federal, state or local prosecuting authority other than the Department;

(b)    Defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the Department, including in a proceeding in a foreign jurisdiction. Defendant further agrees to waive his Fifth Amendment privilege against self-incrimination for the purpose of this agreement;

(c)    Defendant agrees voluntarily and at his own expense to attend any interviews, conferences, grand jury, trial and other legal proceedings as the Department may request, including meetings with any foreign authority or regulator;

(d)    Defendant agrees to provide truthful, complete and accurate information and testimony and understands that any false statements made by the defendant to the grand jury or at any court proceeding (criminal or civil), or to a government agent or attorney can and will be prosecuted under the appropriate perjury, false statement or obstruction statutes;

(e)    Defendant agrees to provide to the Department all documents in his possession or under his control relating to all areas of inquiry and investigation;

(f)    Should the recommended departure under Section 5K1.1 of the Sentencing Guidelines, if any, not meet Defendant's expectations, Defendant understands that he remains bound by the terms of this agreement and cannot, for that reason, withdraw his plea.

### Waiver of Appeal

10.    Defendant is aware that Title 18, U.S.C. Section 3742 affords a defendant the right to appeal the sentence imposed. Defendant agrees to waive the right to appeal the sentence imposed or the manner in which the

Court determined it.  Defendant may appeal <u>only</u> a sentence imposed above the statutory maximum.  Additionally, Defendant is aware that Title 28, United States Code, Section 2255 affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final.  Defendant waives the right to contest his conviction or sentence by means of **<u>any</u>** post-conviction proceeding, **<u>including but not limited to Title 28, United States Code, Sections 1651, 2241 and 2255</u>**.

11.    Defendant further waives any rights under Title 28, United States Code, Section 2241 to challenge the manner in which the sentence is executed or the legality of Defendant's detention.  In exchange for this Agreement with the United States, Defendant waives all defenses based on venue, speedy trial under the Constitution and Speedy Trial Act, and the statute of limitations with respect to any prosecution that is not time barred on the date that this Agreement is signed, in the event that:  (a) Defendant's conviction is later vacated for any reason;  (b) Defendant violates any provision of this Agreement;  or (c) a court later permits Defendant to withdraw his plea.

12.    In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court.  Defendant is also aware that any estimate of the possible sentencing range under the Sentencing Guidelines

7

that he may have received from his counsel, the United States or the Probation Office, is a prediction, not a promise, **did not induce his guilty plea**, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence Defendant will receive. Defendant further understands and agrees that the Sentencing Guidelines are "effectively advisory" to the Court. United States v. Booker, 125 S. Ct. 738 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

13. Defendant understands and agrees that he makes each and all waivers contained in this Agreement in exchange for the concessions made by the United States in this Agreement.

## The Agreements of the United States

14. The United States agrees to each of the following:

(a)     At the time of sentencing, the United States agrees to dismiss counts Two through Four of the Indictment;

(b)     At the time of sentencing, the United States agrees not to oppose Defendant's anticipated request to the Court and the United States Probation Office that he receive a two (2) level downward adjustment pursuant to U.S.S.G. Section 3E1.1(a)

should Defendant accept responsibility as contemplated by the
Sentencing Guidelines;

(c)     If Defendant qualifies for an adjustment under U.S.S.G. Section
        3E1.1(a), the United States agrees to move for an additional
        one-point reduction pursuant to U.S.S.G. Section 3E1.1(b)
        based on the timeliness of the plea or the expeditious manner in
        which Defendant provided complete information regarding his
        role in the offense; and

(d)     If Defendant fully complies with the understandings specified
        in this Agreement, he will not be further prosecuted criminally
        by the Department for any conduct described in the Indictment
        or otherwise disclosed by him to the Department as of the date
        of this Agreement.  This Agreement does not provide any
        protection against prosecution for any crimes except as set forth
        in the immediately preceding sentence

### United States' Non-Waiver of Appeal

15.     The United States reserves the right to carry out its

responsibilities under Guidelines sentencing.  Specifically, the United States

reserves the right:

(a)     to bring its version of the facts of this case, including its
        evidence file and any investigative files, to the attention of the
        Probation Office in connection with that office's preparation of
        a presentence report;

(b)     to set forth or dispute sentencing factors or facts material to
        sentencing;

(c)     to seek resolution of such factors or facts in conference with
        Defendant's counsel and the Probation Office;

(d)     to file a pleading relating to these issues, in accordance with
        U.S.S.G. Section 6A1.2 and Title 18, United States Code,
        Section 3553(a); and

(e)   to appeal the sentence imposed or the manner in which it was determined.

## Sentence Determination

16.   Defendant is aware that the sentence may be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, Section 3553(a). Defendant nonetheless acknowledges and agrees that: (a) the Court has justification and authority to impose any sentence up to and including the statutory maximum set for the offense to which Defendant pleads guilty; (b) the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines; and (c) any sentence within the Sentencing Guidelines range determined by the Court is reasonable. Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentencing imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, Defendant cannot, for that reason, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

## Rights at Trial

17.    Defendant represents to the Court that he is satisfied that his attorney has rendered effective assistance.  Defendant understands that by entering into this agreement, he surrenders certain rights as provided in this plea agreement.  Defendant understands that the rights of a defendant include the following:

(a)    If Defendant persisted in a plea of not guilty to the charges, Defendant would have the right to a speedy jury trial with the assistance of counsel.  The trial may be conducted by a judge sitting without a jury if Defendant, the Department and the Court all agree;

(b)    At a trial, the Department would be required to present witnesses and other evidence against Defendant.  Defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them.  In turn, Defendant could, but would not be required to, present witnesses and other evidence on his own behalf.  If the witnesses for Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court;

(c)    At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify.  However, if Defendant desired to do so, he could testify on his own behalf.

## Stipulated Factual Basis for Guilty Plea

18.    Defendant is pleading guilty because he is in fact guilty of the charge contained in Count 1 of the Indictment.  In pleading guilty to Count 1 of the Indictment, Defendant acknowledges that the facts as stated in the

stipulation contained below are true, and if the case proceeded to trial, the Department would be able to prove those facts beyond a reasonable doubt. This factual basis is not a complete recitation of all facts relevant to the underlying criminal conduct or known to Defendant to relate to that conduct, nor does this factual basis include all the relevant conduct that may be considered by the Court for sentencing purposes. Defined terms below (e.g., "Doe 1") have the same meaning ascribed to them in the Indictment, which is hereby expressly incorporated by reference into this Agreement.

19.    In and around late 2003, Defendant, Doe 1, Consultants 1 and 2, certain GCCB Employees, and others, known and unknown, agreed to make a series of corrupt payments totaling in excess of $6 million to, among others, officials of NNPC, NAPIMS, a senior official in the executive branch of the federal government of Nigeria, and to the Political Party, as well as to officials of SPDC, to assist in obtaining the EGGS project and its optional scopes of work. In order to secure the funds for these anticipated payments, Doe 1, Consultant 1 and others caused WWA to enter into sham "consultancy agreements" with Company S and, later, Company F, pursuant to which, in exchange for purportedly legitimate consultancy services (such as advice and information about local labor, raw materials, and introductions to persons of authority in the Nigerian government), those entities invoiced

WWA for 3% of the contract revenue received by WWA for certain

Nigerian construction and engineering projects, including the EGGS project.

The invoices directed payment to a bank outside the United States.

20.     At the direction of Doe 1, Defendant included the anticipated

3% payments to Company S and Company F as an expense in the internal

budget taken from the original "bid run" which he personally made,

approved and negotiated for that project.

21.     Defendant, Doe 1 and others knew that Consultants 1 and 2

were engaged, on behalf of the EGGS Consortium, in corrupt negotiations

with Nigerian officials who had influence over the EGGS business, and that

Consultants 1 and 2 were using and intending to use some or all of the funds

paid from a bank account in Houston, Texas at the direction of personnel in

WGI's administrative headquarters, to Company S and Company F to make

improper payments to those officials in order to assist in obtaining and

retaining the EGGS business.  Defendant, Doe 1 and others known and

unknown authorized Consultants 1 and 2 to conduct these negotiations and

make offers, payments and promises to pay the officials for the corrupt

purposes described above.  Defendant, Doe 1 and others commonly referred

to the promises to make such payments as "commitments."

22.     By late 2004 some of the commitments had been paid to the
Nigerian officials.  However, commitments of millions of dollars more
remained to be fulfilled through the continued receipt by the EGGS
Consortium of EGGS contract revenue, the payment of 3% of that revenue
to Company S and Company F (i.e., Consultants 1 and 2), and subsequent
transfer of all or part of those funds to Nigerian officials.

23.     In late 2004, Defendant, Doe 1 and certain GCCB Employees
became concerned that the EGGS Consortium's ability to obtain the EGGS
Phase 2 project was in jeopardy, at least in part due to competition and
protests from an Italian company which was one of the original EGGS
bidders.

24.     In January 2005, WGI announced Doe 1's resignation from
WGI and the commencement of an internal investigation into allegations of
tax improprieties relating to a WII Bolivian subsidiary operating under Doe
1's management.  The internal investigation quickly expanded to include the
alleged corrupt activities of Doe 1 in Nigeria and WGI soon ceased paying
Company F's invoices and terminated the "consultancy agreement" between
WWA and Company F.  In Nigeria, Defendant, Brown and other WII
employees learned of demands on behalf of the Nigerian officials for
continued payment of the outstanding commitments related to the EGGS

business. Defendant, Brown, GCCB Employees 1 and 2 and others became concerned that failure to continue paying the commitments would result in interference with WII's business operations and potential loss of the EGGS Phase 2 contract (which had not yet been awarded), valued at approximately $141,000,000.

25.    In and around January and February 2005, Defendant, Brown, Consultant 2, GCCB Employees 1 and 2, and others, known and unknown, agreed that Defendant and Brown would raise approximately $1,850,000 in cash in Nigeria in order to pay some of the millions of dollars in outstanding commitments that Doe 1 and Consultants 1 and 2 had previously made on behalf of WGI, WII, the Willbros Nigerian Subsidiaries, and the EGGS Consortium, regarding the EGGS project and other projects. Defendant, Brown and others determined that $1,850,000 in cash was unavailable to them through WGI, WII or the Willbros Nigerian Subsidiaries, in part because of the increased scrutiny caused by WGI's ongoing internal investigation, and thus resorted to outside sources for most of the funds. Defendant, Brown, GCCB Employees 1 and 2 and others agreed upon alternative sources of funding.

26.    In and around February 2005, GCCB Employee 2 delivered a suitcase containing $1,000,000 cash to Brown at Brown's office in Lagos,

Nigeria in the form of a "loan." Brown then delivered the money to Consultant 2, pursuant to another purported "loan," with the intent that Consultant 2 pay the money to the relevant Nigerian officials.

27.    In and around February and March of 2005, Defendant borrowed the Nigerian Naira equivalent of approximately $500,000 cash from principals of Company K, with the intent of using those funds to make payments towards the outstanding commitments to Nigerian officials described above. The cash was transferred from Company K to Consultant 2 for further transfer to Nigerian officials.

28.    In and around February and March 2005, Defendant directed the withdrawal of the Nigerian Naira equivalent of approximately $350,000 from a petty cash account in Nigeria maintained by one of the Willbros Nigerian Subsidiaries for the purpose of transferring the funds to Consultant 2 for further payments to Nigerian officials. Pursuant to a long-standing practice known to Defendant, these funds were raised over several weeks by falsely inflating petty cash funding requests included within weekly operational funding requests transmitted to WGI's administrative headquarters in Houston, Texas, and by covering the inflated amounts with invoices from fictitious vendors representing purportedly legitimate business expenses.

29.     In response to these funding requests, WGI treasury department personnel in Houston, Texas, wire transferred United States dollars from a company bank account in Houston to a company bank account in Nigeria, where the currency was converted to Nigerian Naira and transferred to the relevant petty cash accounts.  Once sufficient funds had accumulated, Defendant caused the transfer of the Nigerian Naira equivalent of approximately $350,000 to Consultant 2 to make the remainder of the corrupt payments to the Nigerian officials.

## OVERT ACTS

30.     In furtherance of the conspiracy and to achieve its purpose and object, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Texas, and elsewhere, the following overt acts, among others:

a.     On or about November 17, 2004, in order to pay a Company F invoice, an employee in the treasury department at WGI's administrative headquarters in Houston, Texas, caused a wire transfer of $870,623 to be made from a WII bank account located in Houston, Texas, to a Company F bank account outside the United States;

b.     On or about December 20, 2004, Doe 1 and CN approved for payment and forwarding by commercial carrier from Nigeria to WGI's

administrative headquarters in Houston, Texas, Company F invoice # 2004-03P.02 for $785,949;

      c.    On or about January 29, 2005, Defendant sent an email to Brown and to a senior WII executive in Houston, Texas, forwarding "an internal NAPIMS document" obtained from GCCB Employee 2 regarding the status of the EGGS Phase 2 award to the EGGS Consortium, and proposing a strategy to secure the award which included, among other things, entering into a "consultancy agreement" with a "political friend" of Defendant's whom Defendant "would imagine . . . charges quite a bit for his services," which services Defendant described as approaching a senior NAPIMS official on behalf of WGI to "get [EGGS Phase 2] back for us . . ."

### Breach of Plea Agreement

31.    If Defendant should fail in any way to fulfill completely all of his obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand. If at any time Defendant retains, conceals or disposes of assets in violation of this plea agreement, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been

disclosed by Defendant, whether prior or subsequent to this plea agreement, and all leads derived therefrom, may be used against Defendant in any prosecution.

32.     Whether Defendant has breached any provision of this plea agreement shall be determined solely by the Department, whose judgment in that regard is final.

### Complete Agreement

33.     This written plea agreement, consisting of twenty (20) pages (including the signature pages), together with the attached addendum of Defendant and his attorney, constitutes the complete plea agreement between the United States, Defendant and his counsel. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

34.     Any modification of this plea agreement must be in writing and signed by all parties.

Filed at Houston, Texas, on November 5 , 2007

_____
JASON EDWARD STEPH
Defendant

Subscribed and sworn to before me on

_November 5_____, 2007.

MICHAEL N. MILBY
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk


APPROVED:

DONALD J. DeGABRIELLE, JR.
United States Attorney

By: _____    By: _____
James R. Buchanan                        Matt Hennessy
Assistant United States Attorney         Attorney for Defendant
Southern District of Texas               Jason Edward Steph

STEVEN A. TYRRELL
Chief, Fraud Section
MARK F. MENDELSOHN
Deputy Chief, Fraud Section

By: _____
Thomas E. Stevens, Trial Attorney

20

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF TEXAS

# HOUSTON DIVISION

## PLEA AGREEMENT - ADDENDUM

I have fully explained to Defendant his rights with respect to the pending Information. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines that may apply in this case. I have also explained to Defendant that the Sentencing Guidelines are only advisory and that the Court may sentence Defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of this plea agreement with Defendant. To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.

Dated: November 5, 2007

Matt Hennessy
Attorney for Defendant

21

I have consulted with my attorney and fully understand all my rights with respect to the Information pending against me. My attorney has fully explained and I understand all of my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual that may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms.

Dated: November 5, 2007

Jason Edward Steph
Defendant

22